IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| RPC, INC., CUDD PUMPING SERVICES, INC., and BRONCO OILFIELD SERVICES, INC., § § § § | | |
| *Plaintiffs*, § § | | |
| vs. § § | 6:06cv152 | |
| RICK PRUDHOMME, ROY E., AGUILAR, PREMIUM PUMPING SERVICES ENTERPRISES, INC., PRECISION RENTAL SERVICES, INC., CHARLES V. SMITH, and CATHY PRUDHOMME, § § § § § § § § | | |
| *Defendants*. § | | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiffs' Motion to Dismiss the Counterclaim of Defendants Roy E. Aguilar, Premium Pumping Services Enterprises, Inc., and Charles V. Smith (Docket No. 51), Plaintiffs' Motion to Dismiss First Amended Counterclaim of Roy E. Aguilar, Premium Pumping Services Enterprises, Inc., and Charles V. Smith and Motion for Summary Judgment (Docket No. 117), and the responses and replies thereto. After a hearing on the motions, the Court **DENIED** Plaintiffs' motions to dismiss as moot and **GRANTED** Plaintiffs' motion for summary judgment (Doc. No. 281).

**BACKGROUND**

On April 1, 2003, Plaintiffs RPC, Inc. ("RPC") and Cudd Pumping Services, Inc. ("Cudd") (collectively "Plaintiffs"), RPC's wholly owned subsidiary, entered into an Asset Purchase Agreement whereby RPC and Cudd obtained all, or substantially all, of the assets comprising the

company that is today Plaintiff Bronco Oilfield Services, Inc. ("BOS").[1]  Plaintiffs bought these assets from Defendant Rick Prudhomme and his wife, Defendant Cathy Prudhomme ("the Prudhommes"), the sole shareholders of a pumping services company based in Corpus Christ, Texas – the original Bronco Oilfield Services, Inc. ("Bronco").  Plaintiffs paid the Prudhommes approximately $11,000,000 and other valuable consideration for Bronco's assets.

In addition to the Asset Purchase Agreement, the parties also executed (1) a Noncompetition Agreement and (2) two Employment Agreements.  These documents were executed simultaneously with, and were ancillary to, the Asset Purchase Agreement.  Both the Noncompetition Agreement and the Employment Agreements contained restrictive covenants.  After the Asset Purchase Agreement, Noncompetition Agreement and Employment Agreements were executed, Plaintiffs used their newly acquired assets and, with the Prudhommes' assistance, began providing services to customers in Texas, Oklahoma and Wyoming.  The relationship between Plaintiffs and the Prudhommes soon deteriorated, however, and Plaintiffs sought to terminate the employment relationship.  The conclusion of the parties' relationship was memorialized in a resignation letter authored by Plaintiffs and signed by the Prudhommes, said letter detailing the final responsibilities and obligations of each party.  Attached to the resignation letter was an addendum that guaranteed the Prudhommes a $25,000 payment on February 7, 2005, and an additional $25,000 payment on February 7, 2006, in return for their continued compliance with the restrictive covenants contained in their Employment Agreements.

On April 5, 2006, Plaintiffs sued the Prudhommes for breach of the restrictive covenants contained in the Noncompetition Agreement, the Employment Agreements, and the Prudhommes'

---

[1] RPC, Cudd and BOS will hereinafter be collectively referred to as "Plaintiffs."

Resignation Agreement.[2] Plaintiffs allege that, shortly after the Prudhommes' departure, Rick Prudhomme began a "surreptitious scheme to breach the restrictive covenants to which the Prudhommes had agreed when they sold Bronco's assets to [Plaintiffs] . . ." More specifically, Plaintiffs contend that the Prudhommes, both directly and acting through other individuals, including Defendants Charles Smith ("Smith") and Roy Aguilar ("Aguilar"), almost immediately launched two competing operations in direct violation of the non-compete agreements. Plaintiffs also sued all Defendants for breach of fiduciary duty, misappropriation of trade secrets, tortious interference with existing and prospective contracts, assisting in the breach of fiduciary duty, unjust enrichment, and conspiracy.

Thereafter, on May 25, 2006, Defendants Aguilar, Smith and Premium Pumping (the "Premium Defendants") filed counterclaims against Plaintiffs, asserting violations of § 2 of the Sherman Act and Texas Business and Commerce Code § 15.05. Plaintiffs filed a motion to dismiss (Doc. No 51), highlighting considerable pleading defects. The Premium Defendants then sought and obtained leave to amend their counterclaim to clarify allegations in their counterclaim and to address the issues raise by Plaintiffs' motion to dismiss. Plaintiffs then filed an amended motion to dismiss and motion for summary judgment (Doc. No. 117). Having denied the motions to dismiss as moot and having granted Plaintiffs' motion for summary judgment after a hearing on the merits, the Court sets forth its reasons as follows.

### SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted if the record, taken as a whole, "together

---

[2]Cathy Prudhomme was added as a Defendant in Plaintiffs' First Amended Complaint (Docket No. 40) filed on May 25, 2006.

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). The Supreme Court has interpreted the plain language of Rule 56 as mandating "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The party moving for summary judgment, the movant, "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (an banc) (quoting *Celotex*, 477 U.S. at 323-25). A fact is material if it might affect the outcome of the suit under the governing law. *Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Issues of material fact are "genuine" only if they require resolution by a trier of fact and if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Merritt-Campbell, Inc.*, 164 F.3d at 961. If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075.

If the movant meets this burden, Rule 56 requires the opposing party to go beyond the pleadings and to show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1180 (5th Cir. 1996); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by

argument, conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585 (1986); *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075.

When ruling on a motion for summary judgment, the Court is required to view all justifiable inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Merritt-Campbell, Inc.*, 164 F.3d at 961. However, the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.), *as modified*, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a reasonable jury to return a verdict in the opposing party's favor, there is no genuine issue for trial, and summary judgment must be granted. *Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 249-51; *Texas Instruments*, 100 F.3d at 1179.

**APPLICABLE LAW**

In order to prevail on a claim of attempted monopolization under § 2 of the Sherman Act, a plaintiff must prove (1) the defendant has engaged in predatory or anti-competitive conduct (2) with a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power exists. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993). The defendant must also show that it has sustained an antitrust injury. *Id.*

**ANALYSIS**

Anti-competitive Conduct

The Premium Defendants contend that by initiating litigation against them, Plaintiffs engaged in anti-competitive conduct in violation of § 2 of the Sherman Act and Texas Business and

5

Commerce Code § 15.05 as the litigation "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of Counter-Plaintiffs . . . and to force them to incur significant legal fees in hopes of gaining a competitive advantage over [them]." Plaintiffs argue in response that because the litigation is not sham, it is protected activity under the *Noerr-Pennington* doctrine and not subject to antitrust liability.

As recognized by the United States Supreme Court, the First Amendment right to petition the government protects the right to bring suit in state and federal courts. *See California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972). Accordingly, the act of filing suit is generally immune from antitrust liability. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 380 (1973). The Courts have recognized only one exception to the *Noerr-Pennington* doctrine – sham litigation intended to disguise tortious or anti-competitive activity. *Noerr,* 365 U.S. at 140. In order to constitute sham litigation, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits, and such baseless lawsuit must conceal an attempt to interfere directly with the business relationships of a competitor. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60-61 (1993).

Plaintiffs sued the Premium Defendants for breach of fiduciary duty, misappropriation of trade secrets, tortious interference with existing and prospective contracts, assisting in the breach of fiduciary duty, unjust enrichment, and conspiracy. In light of the evidence before the Court, none of Plaintiffs' claims can be considered baseless. On July 18, 2006, the Court issued its Memorandum Opinion and Order (Doc. No. 95) in connection with the issuance of a temporary injunction. In said Order, the Court found that Plaintiffs had demonstrated a substantial likelihood of success with respect to their claims that Defendants Rick and Cathy Prudhomme violated the

terms of the restrictive covenants contained in their Noncompetition and Employment Agreements, including the covenants not to compete, covenants not to solicit employees and covenants not to solicit customers. Given the facial validity of the agreements underlying Plaintiffs' allegations, and the Prudhommes' relationship to Premium Pumping, Smith, and Aguilar, it cannot be said that the initiation of this lawsuit was a mere sham.

Evidence before the Court indicates that both Smith and Aguilar were, at all times, aware of the Prudhommes' restrictive covenants. Accordingly, because Plaintiffs have demonstrated a likelihood of success in establishing that the Prudhommes are the *de facto* owners of Premium Pumping, and because Smith and Aguilar are the directors of Premium Pumping, it necessarily follows that Plaintiffs' claims are not baseless. Although the Court found that Plaintiffs failed to demonstrate a likelihood of success on their claims of trade secret misappropriation, it is not inconceivable to believe that a jury might find to the contrary. Even if said claim was wholly without merit, which it is not, this would not be sufficient to render the entire litigation baseless. Thus, the Court finds that the instant lawsuit is not sham litigation and therefore protected activity under the *Noerr-Pennington* doctrine.

<u>Remaining Elements</u>

Neither can the Premium Defendants show a specific intent to monopolize or a dangerous probability of achieving monopoly power, which are also required to prevail on an antitrust claim. At the hearing, counsel for the Premium Defendants conceded that Smith and Aguilar do not have standing to pursue the antitrust claims. However, as a competitor in fluid pumping services in the East Texas oilfield, counsel argued that Defendant Premium Pumping has standing because it has been harmed as a competitor. Contrary to this argument, however, the Sherman Act protects

competition, not competitors. *See Spectrum Sports*, 506 U.S. at 458.

Section 2 of the Sherman Act forbids monopolization and attempts to monopolize. 15 U.S.C. § 2. The offense requires the possession of monopoly power in a relevant market that has both product and geographic dimensions. *See In re Educational Testing Serv. Praxis Principles of Learning and Teaching: Grades 7-12 Litigation*, 429 F. Supp. 2d 752, 756 (E.D. La. 2005). The allegation that defendant holds a predominant share of the relevant market will usually satisfy the market power element of a monopolization claim. *Id.* (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)). The case law supports the conclusion that a market share of more than 70 percent is generally sufficient to support an inference of market power. *See, e.g., Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 481 (1992).

In this case, the Premium Defendants merely cite that Plaintiffs are funding an 8 to 10 million dollar expenditure into its fluid pumping business. A desire to spend money to expand one's business is not evidence of an "attempt to monopolize," let alone a "dangerous probability of success." Moreover, Premium cites no evidence as to the effect this expenditure will have on its market share of the fluid pumping services in the East Texas area. In fact, Premium Pumping's counsel conceded at the hearing that he had no proof of Plaintiffs' market share. The Premium Defendants' concession of no proof of the market share is fatal to its claim.

## CONCLUSION

Because the Premium Defendants fail to (1) show this is sham litigation, (2) produce evidence of Plaintiffs' market share, (3) fail to prove that Plaintiffs show a dangerous probability of monopolizing the market, coupled with the fact that (4) Defendants concede Smith and Aguilar have no standing, the Court finds that the Premium Defendants fail to present evidence as to the elements

of its antitrust claim to survive summary judgment.  Accordingly, the Court holds that Plaintiffs' motion should be **GRANTED** against the Premium Defendants on their antitrust attempt-to-monopolize claims.

**So ORDERED and SIGNED this 19th day of January, 2007.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE